THE HELEN FAIRLAMB. THE SAPINERO. WHILDEN v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.

(District Court, E. D. Pennsylvania. March 9, 1921.)

No. 29.

Collision ⬥94—Schooner in fault for tacking in course of steamship.

A collision in the daytime on the Delaware river, between a schooner tacking down the river and an overtaking steamship, *held* due solely to the fault of the schooner in failing to keep a proper lookout and changing her course immediately after crossing the course of the steamship, and when so close that the latter was not apprised of the risk in time to impose on her the duty of keeping out of the way, under article 20 of the Inland Rules (Comp. St. § 7894).

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit for collision by Theodore L. Whilden, master of the Schooner Helen Fairlamb against the United States Shipping Board Emergency Fleet Corporation, owner of the steamship Sapinero. Decree for respondent.

Willard M. Harris, of Philadelphia, Pa., for libelant.

Chas. D. McAvoy, U. S. Atty., and T. Henry Walnut, Sp. Asst. U. S. Atty., both of Philadelphia, Pa., for respondent.

THOMPSON, District Judge. This suit arose out of a collision between the Helen Fairlamb, a two-masted schooner, and the steamship Sapinero, which occurred on March 12, 1919, in the daytime in the Delaware river between the mouth of the Schuylkill and Ft. Mifflin. The schooner was light, and was beating down the river with a reefed mainsail and full jib and foresail, the wind about south-southwest and the tide ebb. The schooner drew about 4 feet of water and was about 70 feet in length over all. The Sapinero is a large steamship owned by the United States Shipping Board Emergency Fleet Corporation. She was proceeding down the Delaware river about in mid-channel, loaded, in charge of a pilot and was drawing about 26 feet of water.

The Fairlamb in beating down the river, having tacked to the New Jersey side of the river, had gone about on her port tack to the west of the channel on the Pennsylvania side, and when westward of the channel had gone about again on her starboard tack when the collision occurred. She was struck upon the overhang of her stern; her davit and boat were carried away. The pilot of the Sapinero, seeing that a collision was about to occur, signaled full speed astern, which was obeyed, and ordered the wheel put hard aport, which was also obeyed. Immediately prior to the collision the master of the Fairlamb, who had been below, came on deck and ordered the wheel of the Fairlamb put hard aport, hoping to throw the Fairlamb up into the wind and avoid the collision.

The libelant claims liability through invoking article 20 of the Inland Steering and Sailing Rules (Comp. St. § 7894) providing that, when a steam vessel and sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel. If the circumstances were such as to place the duty of keeping out of the way of the schooner upon the steamship, the schooner under article 21 (section 7895) had the right and duty to keep her course and speed; and if the schooner was proceeding upon a course on her starboard tack sufficiently evident to apprise the Sapinero of the fact that she was upon her course, it was its duty under article 22 (section 7896) to avoid crossing ahead of the schooner. Moreover, the schooner being the privileged vessel, it was the duty of the Sapinero, if the schooner was sufficiently started upon her starboard tack to apprise it of that fact, under article 23 (section 7897) to slacken her speed or stop or reverse.

The witnesses for the Fairlamb were Jaquette, a deckhand, who had been following the sea for 34 years, and who was at the wheel, Shultz,

also a deck hand, and who was attending the jib, Wensel, the cook, and Whilden, the master; the two latter having come upon deck when they saw that a collision was about to occur. Their testimony tended to show that, having crossed a considerable distance ahead of the Sapinero on her port tack, she was obliged to shorten her tack and go about because of the presence west of the channel of an anchored barge, obstructing her course, at a distance variously stated to be 200 feet to 200 yards west of the apparent course of the Sapinero, and that having gone about, she had filled away on her starboard tack, and was standing on a course across the river for 5 or 6 minutes, when the steamer was seen making directly across her course, and 3 or 4 minutes later the collision occurred.

The witnesses on behalf of the Sapinero were Capt. Poynter, the pilot, Chief Engineer Betts, and Capt. Kelley, the master of a Shiping Board tug which was following the Sapinero on her starboard quarter. Their testimony tended to show that, immediately after crossing the bow of the Sapinero on her port tack, the Fairlamb went about and again attempted to cross the bow of the Sapinero upon her starboard tack; that this was done without giving the Sapinero time or opportunity to observe what the intention of the Fairlamb was, nor time to avoid the collision.

There is one very important fact brought out by the testimony of Jaquette and Shultz. They both testified that, when crossing the river to the Pennsylvania or western side, they saw the steamship coming down. There is no evidence that they observed her again until after the schooner went about, and then just as the two vessels were in a position to cause the collision. Jaquette, who was steering, testified that after he went about it was about 5 minutes before he saw the steamer, and could not tell how long after that the collision occurred, but immediately upon seeing her, and the captain coming on deck, he ported his helm and threw her up to the wind. Schultz, who was the only other member of the crew on deck, testified that he did not see the steamer until about 5 minutes after the schooner came about on the starboard tack; that he was tending jib when he happened to see it, and he then called to Jaquette; that the steamer was then about 200 yards away. It is a very significant fact that neither of these men saw the steamer until it was too late to avoid the collision.

The testimony of the witnesses on both sides as to the time and distance is even more unreliable and vague than is customarily observed in collision cases. If the witnesses for the libelant have correctly stated the facts the schooner had gone about and was on her course for 5 or 6 minutes before the steamer was observed, plus 3 or 4 minutes after she was observed before the collision occurred, which would have given ample time for the pilot of the Sapinero to be apprised of her course, to have reversed his engines, and gone to starboard under the stern of the schooner.

If the witnesses for the respondent have correctly stated the facts, the Fairlamb attempted to go about immediately after crossing the bow of the steamer on her port tack, and had not time to fill out on her ·

course before she put herself directly in the path of the Sapinero. We must therefore look to the circumstances and to the probabilities, in order to determine the fault which caused the collision. It is uncontradicted that the Fairlamb did not continue on her port tack as far into shore as she might have done. She was light, with a draught of but 4 feet, and there was ample depth inside of where the barge lay to permit her to go further toward the shore. The reason she did not do this is stated by all the witnesses for the libelant to be due to her course being obstructed by the barge, although the respondent's witnesses testified that she was below the barge when she went about.

Accepting the libelant's version as true, it is apparent that there was not sufficient space between the course of the steamer and where the barge lay for the schooner to go about and fill away on her starboard tack. With but two men on deck, one at the wheel, intent upon watching the sails, and the other tending the jib, the probability is strongly toward their attention being so diverted, and their view so obstructed by the sails, that they did not see how close the steamship was until after the schooner had gone about.

It is apparent from the testimony that there was a fair sailing breeze. It is also apparent that the collision occurred so immediately after the schooner went about that she could not have been upon her course a sufficient length of time to apprise the steamer that she was on that course, so as to enable it to keep out of her way. The pilot, captain, and the first officer of the steamship were upon the bridge, and Kelley, the captain of the tug, was in a position where he could observe both vessels. While the estimate of the pilot, the master of the tug, and of Engineer Betts as to the distance between the schooner and steamer, when the former crossed the latter's bow, is incredible, yet their testimony that the schooner attempted to change her course and go about when the steamship was too close upon her is entirely probable, when taken in connection with the short distance between the course of the steamship and the position of the barge. The steamship blew her whistle, reversed her engines, and ported her helm practically simultaneously.

I am unable to find from the testimony in the case that the schooner was upon a course involving risk of collision long enough to apprise the steamship of the risk, so as to impose the duty upon her under article 20 of the Inland Rules (Comp. St. § 7894) to keep out of the schooner's way, nor to find that the schooner was justified in keeping her course and speed upon her starboard tack. I find that the two men upon the deck of the schooner, through attempting to go about without having sufficient time and space to justify them in doing so, and through not keeping a proper lookout for the steamship, did not, under article 27 of the Inland Rules (section 7901), give due regard to the special circumstances, which, if observed, would have rendered it entirely possible, without danger of collision, to have either passed the barge or to have laid to, until the steamship was out of the way. In short, the schooner attempted to change her course immediately after crossing the steamship's bow and thereby caused the

collision. It is found, therefore, that the collision was due solely to the careless and negligent manner in which the Fairlamb was navigated, and the libel must be dismissed.

A decree will be entered accordingly, with costs to the respondent.